Dr. Shah v. Univ. of TX SW Medical School Dr. Shah v. Univ. Disciplinary The whole thing He still wasn't given the limited process to just do for that type of a decision. You seem to be saying he needs notice of what would amount to a violation. I thought the notice is, you know, before we terminate you, here's the reasons you got these two write-ups. I mean, that's the notice, right? You don't have to be told, oh, you're asking me this, that's going to lead to a write-up if you keep asking me. Well, I don't think that's quite right. What the Supreme Court said in Horowitz and what this court said in Shaboon is that even for academic dismissals, academic decisions, you have to be given notice that the university is unsatisfied with your performance and what the consequences will be if you fail to improve. During his clinical year, he got two of these violations, and the policy says if you get two, we're going to the committee. And before he went to the committee, didn't he meet with one of the individuals on the committee? He met with Dr. Emmett Shaw after Dr. Shaw had already decided to submit the PEF. He did not meet with Dr. Shaw after Dr. Shaw wrote this letter to the committee alleging that he engaged in academic dishonesty. So he at no point had notice of those charges against him. But the letter wasn't controlling. The two negative evaluations were what brought him before the committee. They were what brought him before the committee. But as Judge Costa points out, and Judge Weiner also, that all of that gets considered. This was clearly before the committee. In fact, Dr. Shaw was on that committee. He was the chief accuser and also was on the committee making the decision about Mr. Shaw's career. So it simply isn't sufficient to say, well, he knew that if he got two PEFs, he could be terminated. He has to know what the problems are that will lead to his getting these PEFs. Now, with the first PEF, he had no idea that doing what he did, asking for permission to delay the start of his first rotation, would lead to a PEF. In fact, this is shown by the fact that… They said he waited too long to ask. Wasn't there some controlling time frame within which you could ask to delay starting your first clinic? No. The allegations are that there is no period. There is no deadline. It doesn't sound like a way to run a med school. Are you sure about that? Yes, that's what the allegations are, and no one has contested that. No one has said, well, here is the deadline for doing this. Now, he went ahead and asked for permission to do this at the behest of Dr. Mihalik. His plan was to delay the start of his first rotation, which is routinely done. The only reason he went a different direction is because of Dr. Mihalik. Now, it seems extraordinarily arbitrary to say one professor tells you to do something, and you do it, and the other professor grants you permission to do that, but then turns around and issues a professionalism evaluation form against you that ultimately leads to your dismissal from medical school. That is capricious. That is arbitrary. And that is one of the problems with these professionalism policies, not that they exist, not that schools have them, but that they use them to dismiss students like Baroon. Going back to the—I mean, it seems you need to get this in the disciplinary world to get the process that would allow you to prevail. Let me ask—take outside the medical context. Let's say you have a history class, undergraduate college. You turn your history paper in late, and you get written up for that. Academic or disciplinary? If you actually turned it in late. Right, just like he turned in his patient evaluations late. We disagree with that fact, Your Honor. That is not what is alleged. Well, let's assume he did. Assuming he did, yes, that would be academic. But we say that's not the case here. The allegations are that he had them. He was turning them in. Dr. Vickiosa refused to evaluate them, and saying that they were late, saying he didn't turn them in, is a pretext because his allegations are he had them ready to turn in. But they were full of typos and errors and were rejected on that basis. Well, one of them is alleged by Dr. Vickiosa to have some errors. And, in fact, it probably did because it was done overnight. The fact is these patient write-ups usually are assigned with two weeks to complete. In the eight weeks that Varun had of internal medicine, he was assigned five. Three of them were during the two-week rotation with Dr. Vickiosa. She was setting him up for failure. She was assigning him to do one overnight. The one that she said had typos and had formatting that was askew, that was one he had to do overnight. Three chances. I mean, it seems to me if she's out to get him, that's inconsistent with the leniency she showed him. Well, I disagree, Your Honor. She didn't show him any leniency. Assigning more than four times the average number of write-ups during this period is hardly leniency. Refusing to evaluate any of his write-ups is not leniency. You know, this paranoid story about their being out to get him just doesn't hang together to me. You've got a man who's in his third year. They've got all that invested in the first two years. They're not out to kick out people in that class. Well, we're not saying the university is set to do that. We don't know. Well, you've got three of the professors that are saying that. Three professors saying that? You've got Visiosa, Amit Shah, and Patricia Bergen. Well, Patricia Bergen, she did not give a negative clinical evaluation. She's running the process. She was running the SPC, yes. She had had personal problems, personal criticisms of Varun's personality. The rest of the platoon is out of step, and he's not. No, I don't think that's what the allegations are. The allegations are that she was setting him up for failure for whatever reason we don't know. That's why I use the term paranoia. Well, I don't think it's paranoia, Your Honor. She gave him more than four times the amount of write-ups to do than the rest of his time in internal medicine. She refused to evaluate any of his write-ups. And the fact of the matter is this is on a motion to dismiss. The court has to take Mr. Shah's allegations as true. He has alleged bad faith. He has alleged that what she says is not true. Yet the court, the district court, instead of crediting Mr. Shah's allegations, credited the university's characterization, credited Vicky Oso's allegations, even though Mr. Shah's allegations are that those are not true. You're out of time, but you saved time for rebuttal. Thank you, Mr. Pledge. All right, Mr. Dower. May it please the court, my name is Benjamin Dower, and I am here representing UT Southwestern and Dean Fitz. I want to start with pushing back on something that was just said about having to defer to the allegations. Under Twombly-Iqbal, the court is obliged to defer to factual allegations, but many of the allegations, in fact probably the majority of the allegations in the live pleading are actually legal conclusions. Bad faith is a conclusion, not a factual allegation. Similar to a Title VII race discrimination case, the plaintiff can't just simply allege they discriminated against me because of race, even though that in some sense feels like a factual allegation, it's really a legal conclusion. And so you have to allege facts, not conclusions, that would support the reasonable, plausible inference that there was actually bad faith. And if you look at the factual allegations in the live pleading as opposed to the legal conclusions, the vast majority of the factual allegations have nothing to do with the decision-making body that made the decision on the dismissal. The Student Promotions Committee, the SPC, is the entity that made the decision about whether Mr. Shaw would be dismissed, and really the only factual allegations that relate to that entity are that Dr. Bergen gave Mr. Shaw a relatively low evaluation at some point, I believe, during his pre-clinical career, and that Dr. Shaw had performed that investigation. And even with Dr. Shaw, the allegation isn't that he knew that the factual things that he reported in that letter were inaccurate, but rather simply that they were inaccurate. And in fact, if you look at the Exhibit A, which is filed under seal, it's additional factual allegations. One of them is that Dr. Vicchioso actually deceived Dr. Shaw in making some representations. And so when it comes to the decision-making body here, there are nowhere near enough factual allegations for the court to reasonably infer that that body was in any way biased or acted in bad faith when it made its decision. And going to Judge Costa's point, we totally agree that the right here, assuming that there is one, you know, the U.S. Supreme Court has never actually said there is a right, but we're not asking the court to rule on that, but assuming that there is a right, it's in attendance and pursuit of the medical degree, not in any particular decision that relates to academic performance. And if you take the appellant's logic at face value and saying, well, everything that's in the factual causation that leads to dismissal has due process associated with it, that would mean that every single exam, every single everything in one's academic career has a separate due process attached to it. And there's simply not a single case that I could find that reaches that holding. But in deciding whether the ultimate dismissal was consistent with due process and whether it's academic or discipline, then we probably would have to look at what the nature of the violations were to determine if it fits into the academic box or the discipline box, right? I agree with that, Your Honor. To the extent that the PEFs are reflective of whether this process was academic or disciplinary, there's certainly an issue, but that goes to the nature of the right that's associated here, not with what the right attaches to, if you appreciate the distinction. What would be a difference in the procedural due process if it was termed or labeled academic as opposed to disciplinary? I'm sorry, I'm not sure if I understand the question. What would have to be done differently or would anything have to be done differently if we didn't make the determination or the labeling of academic versus disciplinary dismissal? Well, Your Honor, I think even if this were disciplinary, due process would still be satisfied. If Your Honor looks at the Wheeler v. Miller case, which is a case from this Court in 1999, the additional due process for disciplinary dismissals require nothing more than an informal give and take, and it's clear that Mr. Shaw received much more than an informal give and take. As we just heard, he not only had a chance to address the SPC directly, but he also had a letter that he filed as part of his appellate process, and then additionally, although it's a little bit unclear from the live pleading, the process or the policy itself makes it clear that he could appeal to the dean, but the live pleading is ambiguous about whether he actually exercised that right. But I do want to strongly— If it is a disciplinary dismissal, isn't the letter from Dr. Shaw that he didn't know about, doesn't that pose a notice problem under the greater protection you get for disciplinary dismissals? I don't think so, Your Honor. I think that even under the disciplinary context, you're not entitled to a point-by-point list of every single thing that could be considered, but I agree that it certainly does require more notice, and that's why it's important for the Court to recognize that this process really was genuinely academic in nature. The Supreme Court in the Horowitz case held that an academic issue or an academic dismissal is one where the decision is reflecting on the fitness of the student, the fitness for the degree that they're seeking. And here, if you look at the—even taking the allegations that Mr. Shaw makes as true, the factual allegations, the record shows that this was, in fact, an academic judgment. And again, this really—the focus should be on the SPC's decision, but even if you look at each PEF, the record shows that it was academic. So he requested, starting with the July 2012 PEF, Mr. Shaw requested an extension on the timing in which he had to take this exam, which is actually required to do clinical rotations unless you get special permission. And the allegation here is that he made that request late, at the last minute. And so in Horowitz, the Court actually held that timeliness, as well as things like personal hygiene, are academic in nature because they go to the responsibility of the doctor in just being responsible. And I want to strongly emphasize that this is not an undergraduate course or an undergraduate degree. We're talking about doctors who are going to be taking care of patients someday, and universities admittedly have a broader scope of what is considered fitness to become a doctor than they would for some other degrees. In one of the cases, for example, cited by Mr. Shaw, he cites a case where the student, I believe, didn't show up to take an exam. And in that case, it was Asimov v. University of Utah, District Court of Utah opinion, the Court actually distinguished between the medical school context of Horowitz and the nuclear engineering context for that student. And if you look at the opinion, it's basically saying, look, if this had been like a medical student, that would be different because there's more at issue with a medical student because ultimately they're going to be taking care of patients, and so there's more at issue. But because it's a nuclear engineering student, where those types of responsibilities are perhaps not as important and not as related to the fitness for the degree, then we're going to say this is an academic. Here, again, it cannot be emphasized enough that we're talking about a medical school degree where there's a lot that plays into fitness. And when we go back to the sort of policy underlying Horowitz, where we have to give the university room to make subjective determinations about a student's fitness for the degree that they are seeking, part of that is because it is somewhat subjective. It requires review of cumulative information. This may be a question for counsel opposite, but what is it that is being claimed he did to be disciplined for as opposed to academic? It's not really clear to me, Your Honor. I think maybe they're arguing that because he requested to take this exam late and they didn't like that behavior, that he's being punished for it. But, again, the issue here isn't that he requested an extension on this national exam. This isn't taking an exam on time or not a quintessential academic question? I couldn't agree more, especially given that this isn't just some exam for some course. This is an exam to certify your ability to do clinical rotations afterwards. So unless you get special permission, you can't even start the third year until you take this exam. It's a board, right? I'm sorry? It's a board. That's right. That's right, Your Honor. They don't just give them every other day. They're scheduled for groups. That's right. And so it's critically important that if the student wants an extension on that time, that he do so in a timely manner. And a failure to do so does reflect the student's fitness to become a doctor because, my goodness, when you're practicing medicine and taking care of patients, if you don't request the medicine on time or do other things that are equally important in a timely manner, that affects your ability to take care of patients. With regard to this question of how much notice he received in advance, if you look at the policy itself and you look at the policy on the PEF, it says on page 569 of the record that scheduling and completing the USMLE by the required dates is an essential responsibility. And so while there may not be, at least in the record, a specific date that it's required, Mr. Shah was on notice that scheduling, not just completing, but scheduling the exam in a timely manner is something that he's going to be held to. And so that puts him on notice in advance that this is something that he needs to focus on. An appellant's brief argues that he didn't get enough reminders, that the university should have given him a series of reminders. I think it's on page 6 through 7. And I would just push back on that and remind the court that this is a medical institution, not a high school. And in order to take an exam that's required to do your clinical rotations, the university is not obliged to send continual reminders about that. It's up to the student to be responsible and to demonstrate that responsibility through their conduct. And so the focus here in determining whether it's academic or disciplinary isn't on what was the behavior. Theoretically, you could have some behavior that leads to both a disciplinary and academic process for different reasons. The focus needs to be on why does the university care about this? Are they taking actions to punish the student for doing something wrong? Or are they taking actions because it reflects on the student's fitness for the degree they're seeking? And I think based on that criteria, which is the Horwitz criteria, that this record shows that all of these things were academic in nature. And most self-evidently, if you look at the March 2013 PEF itself, which is in the record on page 738, it shows that patient notes and being prepared, things that are, I don't want to say clearly, but fairly self-evidently academic in nature, were what was at issue there. And in the Horwitz case, the court talked about clinical rotations as part of the academic criterion. In Davis v. Mann, this court held that poor-quality dental charts were academic. And so under this precedent, sloppy patient notes are an academic judgment. Now, Appellant's brief makes much about this allegation of bad faith, saying that you lose your deference, the university loses the deference advantage when the plaintiff alleges bad faith. And I think the strongest case they cite for that proposition is Ikepiazu v. University of Nebraska, which is an 8th Circuit 1985 case. But even in that case, the court held that the faculty were entitled to a presumption of honesty. And so then that goes back to, well, has he alleged facts that show that the decision-maker acted in bad faith? And the decision-maker here with regard to the dismissal is the SPC as a whole. And as I think I opened with, he simply has not alleged facts that affect the judgment of the SPC as a whole that, if true, would show that the committee acted in bad faith to overcome that presumption. And so without a factual allegation that creates that reasonable inference, the university certainly doesn't lose the presumption that this is academic and the deference that they're entitled to. And many of the conclusions that he makes about why the specific things were untrue are too conclusory to be entitled to deference. One of the things in his 11-page Exhibit A where he's going through and says, they say this about me, that's false because. They say this about me, it's false because. And it goes on for, like I said, about 11 pages. One of the things is I don't make excuses. I just ask questions. Now, in an 11-page document, which is essentially excuses, that allegation is simply not entitled to deference. Other things, such as organization or sloppiness, are ultimately subjective. They're neither really objectively true nor false. And that goes right back to the Horowitz deference that the university is entitled to, where we're talking about whether patient notes are sufficient. And really the courts are reluctant to weigh in because they don't really have the expertise, no offense intended, Your Honors, but the expertise to second-guess medical professionals in terms of what is a sloppy patient note, what is sufficient. Those types of judgments are really the essence of why some deference is owed to these experts who are looking over cumulative information in making their determination. With regard to what kind of notice he actually got moving to the procedural due process itself, we have the policy itself, which gives notice. We've got the PEFs, as we discussed, that give notice. You have not one but actually two meetings with Dr. Shah where they discuss the deficiencies that give notice. And I would push back on something that my opposing... Did any of those discuss the plagiarism that was discussed in Dr. Shah's letter, which is a serious allegation that might well have influenced the board? I don't think the record is clear, but I want to push back a little bit against this plagiarism accusation because if you look at Dr. Shah's letter, he's not actually saying he committed plagiarism in a disciplinary conduct. What he's really saying is that he took shortcuts. Like I said, I really encourage you to actually look at the record itself. The accusation isn't that he was academically dishonest and that he plagiarized someone's work. It's that he copied and pasted from a textbook instead of coming up with original notes. And so it really wasn't plagiarism in the disciplinary sense where this was misconduct for which you need to be punished. It goes more to the student's fitness of did he really do the work? Did he put in the time to create the original content to reflect these patient situations as opposed to taking stuff that he'd already done or that's just sort of generic descriptions of the diseases or whatever else. And so the word plagiarism is certainly one that has a lot of strong connotations associated with it. But again, if you look at the record itself, it's clear that this isn't a plagiarism accusation. The word plagiarism may have been sloppy, but that's really the allegation, that he took shortcuts. And that's clear from the record, and I would encourage your honesty. If we read it, does it amount to such as cut and paste, just taking other things and cutting them and pasting them to make his report instead of original? That's right, Your Honor. And I believe that the note that the letter also notes that he did accredit those sources. So he might not have put them in quotes, but he did accredit them. And so the allegation really isn't like he was taking someone's intellectual property and claiming it as his own. The issue here goes to, well, did he do enough work? Did he do original work when he was creating his patient notes, or did he look for opportunities to take shortcuts? And so it's not a plagiarism accusation in any sort of disciplinary sense. And I would also note that opposing counsel argued that due process requires an opportunity to improve after receiving the notice, but that's really not part of the standard. When the Supreme Court was discussing that, it was part of the policy interest, admittedly some of the policy interest in academic deference, but it's not part of the standard. And if you think about that, let's say someone just fails classes, just like an undergraduate student, their sociology major, whatever, they just fail their classes. Are they entitled to then have any additional, like retaking the classes? Does the U.S. Constitution require that? Or is it required that they simply had notice of what was expected of them? Usually there's a syllabus that provides that function. And then afterwards, if they have questions about, well, what did I fail, they can ask. But the law doesn't require them to get a rubric of every single, you know, of the exam that they took, but that's essentially what Mr. Shaw is asking for. And I thought it was interesting that he noted that he admitted that everything in the academic career is potentially at issue when you're doing this cumulative review. So if the law required a point-by-point list of every single thing that they considered in making their dismissal decision, but everything that the student has ever done during their academic career is fair play and fair game for that decision, then how could you ever provide that notice? And when we're talking about an academic decision, that's the minimum of due process required under the law. If you had to give them an itemized list of every single thing that might be considered or was considered, then it would completely formalize what is supposed to be an informal process. Even the disciplinary context only requires an informal give and take, not a list of charges and opportunity to cross-examine witnesses. But make no mistake, that's what Mr. Shaw is asking for here. In the complaint, one of the things he alleges was, my hearing wasn't sufficient because I didn't get an opportunity to cross-examine witnesses. And finally, with the substantive due process issue, all the law requires is that the person making the decision not substantially depart from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise a professional judgment. And here, if you look at what the committee considered, those are things that are all perfectly within academic norms to consider. And Mr. Shaw argues not that they were bad, but that they were untrue, which is not enough under this deferential standard. And I see that I'm out of time. Thank you, sir. Mr. Feige, you have some rebuttal time. I'd like to take issue with counsel's characterization of our arguments, that we want a rubric that tells us everything that could potentially go wrong and the potential consequences for that. We don't believe that's what the law says, and that's not what we're asking for. With respect to the first PEF, we're not asking. What we're asking for is that he be notified that taking the action on the recommendation of another professor to take this course of action as opposed to another one, which no one alleges would have been a problem, is going to end up getting him dismissed from medical school. That wasn't done. We're also not asking for anything more than with the Emmett Shaw letter that he be given notice that these are the allegations being made against him. And contrary to counsel's characterization, these are not minor allegations. Oh, well, maybe he took some. Yes, he said he took shortcuts. He also said that he copied from other students, from residents. These are serious allegations that stigmatize Mr. Shaw, and if he's not allowed to clear his name, they stick with him forever. It simply isn't the case that Dr. Emmett Shaw can accuse this student of plagiarism, using that word, using the word cutting and pasting from other people's work, taking shortcuts at work, and that not be a disciplinary matter, even if it were an academic matter. Mr. Shaw had no notice of these allegations, no opportunity to address them, zero. Now, it's not the case that he's saying, I should be told everything that could possibly happen. I fail a class, and if I don't do the work, I'm going to fail a class. Of course he knows that, and those aren't what the allegations are here. With respect to the 2013 PEF, there's a lot of discussion about, well, bad faith. All he does is say bad faith. That's not what he does. In the complaint, he gives facts about what happened that demonstrate Dr. Vicchioso's bad faith. He demonstrates that she gave him more work during that two-week period to do than he had been assigned in the remaining six weeks of the internal medicine rotations. He shows that her attitude toward him was combative and that she announced in a public hallway that she was going to dismiss him even before the rotation was finished. He alleges, and these are facts, these are not opinions, these are not conclusions, these are facts. He also alleges that the things that she claims to have done, like meeting with him, giving him feedback, did not in fact occur. This is a factual determination that cannot be made at this stage. He says she's lying. If she's lying, that is bad faith. And these are factual determinations that cannot be made by the district court or this court on a motion to dismiss. To make that plausible, this goes back to what Judge Wiener was asking. You have to have some reason why they'd have it out for him. I think you say in your brief that there's professionalism policy you don't like. It's been on the books for a couple years before he gets disciplined. He's the first person, as far as you know, ever punished under it, which is consistent with the fact that these doctors are busy people. They're not trying to kick these students out of med school unless they think there's a real problem with one of the students. So what's the reason for these doctors to be lying and making stuff up about your client? I wouldn't say these doctors. I would say, with respect to the 2013 PEF, Dr. Vicky Oso. We don't know the exact nature of her problem with Varun Shah, but his allegations, which must be taken as true, show a plausible claim that she was acting in bad faith. He alleges that she was lying about him. This isn't mere paranoia. This is factual allegations that must be taken as true. And if it's the case that she was doing things like claiming to have met with him and giving him feedback, that he says that, in fact, never happened, that's prima facie allegation of bad faith. If he says she's lying and the court must take his factual allegations as true, that's bad faith. And that's sufficient under Twombly. It's sufficient under this Court's cases. If it's plausible. If it's plausible, yes. Then the court can't substitute its opinion and make that decision at this point. He has to be given the chance to come forward with evidence to prove this, and that's what he would do if this case gets remanded. Thank you, Your Honors. Thank you, sir. We have the argument. We'll take a short recess.